# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Jerry Gordon and Mohammed Khalid, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 3:20-cv-05535 |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | |
| BARNES & NOBLE COLLEGE BOOKSELLERS, LLC; BARNES & NOBLE EDUCATION, INC.; CENGAGE LEARNING, INC.; FOLLETT HIGHER EDUCATION GROUP; MCGRAW HILL LLC; and PEARSON EDUCATION, INC., | CLASS ACTION COMPLAINT |
| Defendants. | |

1. Plaintiffs Jerry Gordon and Mohammed Khalid, by and through their undersigned counsel, bring this lawsuit on behalf of themselves and all others similarly situated against Cengage Learning, Inc. ("Cengage"), McGraw Hill LLC ("McGraw"), and Pearson Education, Inc. ("Pearson"), three publishers of college and graduate textbooks and other course materials (collectively, the "Publisher Defendants"), and against Barnes & Noble College Booksellers, LLC ("B&N") and Follett Higher Education Group, Inc. ("Follett"), two operators of on-campus college bookstores (together with B&N, the "Retailer Defendants").

2. The allegations herein are based upon Plaintiffs' personal knowledge as to matters relating to themselves and upon information, belief, and the investigation of counsel as to all other matters.

3.      The price of textbooks and other course materials contributes to the staggering amount of student loan debt in the United States, costing the average college student more than $1,200 per year.

4.      The Publisher Defendants dominate the market for the publication and sale of higher education textbooks and course materials while the Retailer Defendants are the dominant commercial operators of on-campus college bookstores in the United States.

5.      Together, Defendants entered into the "Inclusive Access" conspiracy set forth in this complaint, aimed at monopolizing the market for sales of higher education learning materials for any courses and on at any higher education institution subject to the Inclusive Access policy.

6.      Inclusive Access requires that students purchase textbooks and course materials only in electronic format and only from their official on-campus bookstore. Students are prohibited from purchasing such learning materials from any other source, effectively insulating Defendants from competing with off-campus and online bookstores or vendors for the sale of new or used textbooks and other electronic materials.

7.      By monopolizing the market for the sale of course materials in Inclusive Access systems, Defendants are able to charge higher prices for those course materials with no legitimate justification, to the detriment of Plaintiffs and all similarly situated higher education students.

8.      Before the Inclusive Access system was devised and rapidly expanded in recent years, college students would typically compare prices for textbooks and course materials, including prices for new and used textbooks at on-campus and off-campus bookstores as well as various online sources such as Amazon, eBay or other resale websites.

9.      In the context of this increasingly competitive environment, the Publisher and Retailer Defendants conspired to monopolize the market for college textbooks and other course materials by entering into agreements with higher education institutions across the United States to restrain competition and require students to purchase only via Inclusive Access.

10.      By monopolizing the market for college course materials, Defendants are able to charge higher prices with no legitimate pro-competitive justification, to the detriment of Plaintiffs and all members of the proposed Class.

11.      Inclusive Access increases prices of college textbooks and course materials while foreclosing competition, thereby allowing Defendants to increase their profits at the expense of Plaintiffs and other Class members.

12.      Students subject to Inclusive Access policies no longer have purchasing options and are instead mandated to pay for electronic access to textbooks and other course materials and only from official on-campus bookstores.

13.      In the absence of Inclusive Access, many students would revert to purchasing used textbooks from secondary sellers.

14.      The Publisher Defendants refuse to sell Inclusive Access materials to any retailers other than official on-campus bookstores, the majority of which are operated by the Retailer Defendants.

15.      Plaintiffs and other Class members have no legitimate choice other than purchasing Inclusive Access materials at the designated price from their official on-campus bookstore. While students may technically opt out of Inclusive Access systems, that right is illusory at best given that various course assignments and tests are typically tied to the official

program. Many colleges require students that opt out to provide proof of purchasing necessary course materials from another source, which is generally not possible.

16.    At many participating colleges, students are automatically enrolled in Inclusive Access with charges appearing on tuition statements.

17.    There are no apparent pro-competitive justifications for Inclusive Access. Students incur higher costs, are required to purchase electronic materials, and they receive online access for a limited time with no ability to save course materials for future reference or resell them at the end of the semester.

18.    Notably, the soaring textbook prices, the highly consolidated nature of the industry, lack of choice for students, and Inclusive Access are all factors cited by a group of United States Senators in a recent letter to the Department of Justice ("DOJ") Antitrust Division urging close scrutiny of a proposed merger between Defendants Cengage and McGraw-Hill. *See* **Exhibit A** (Apr. 24, 2020 letter from Sens. Blumenthal, Durbin, Feinstein, Smith, Booker, and Hirono to Hon. Makan Delrahim).[1]

19.    The actions of Defendants described herein constitute violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). As a result of those actions, Plaintiffs paid artificially high prices and seek treble damages and injunctive relief on behalf of themselves and all other similarly situated.

---

[1] Just prior to the filing of this complaint, Cengage and McGraw-Hill announced cancellation of the proposed merger, citing "uneconomical fixes" demanded by the DOJ. *See* "BREAKING: McGraw-Hill, Cengage Cancel Merger Under DOJ Pressure," May 4, 2020 (available at https://www.law360.com/articles/1269973/breaking-mcgraw-hill-cengage-cancel-merger-under-doj-pressure).

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a). Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims herein occurred in this District, and in the alternative, under 28 U.S.C. § 1391(b)(3), as this court has personal jurisdiction over Defendants Pearson and B&N, both of which are located and transact business in this District.

22.     This Court also has personal jurisdiction over Defendants Cengage, Follett and McGraw because they each conduct substantial business in this District and conspired with Defendants based in New Jersey. Moreover, all Defendants committed acts in furtherance of the conspiracy in this District, including establishing Inclusive Access programs at New Jersey colleges and universities.

## PARTIES

23.     Plaintiff Jerry Gordon is a citizen and resident of Illinois. During the relevant time period, he was required to purchase and did purchase college textbooks and course materials through Inclusive Access directly from one or more of the Defendants.

24.     Plaintiff Mohammed Khalid is a citizen and resident of Maryland. During the relevant time period, he was required to purchase and did purchase college textbooks and course materials through Inclusive Access directly from one or more of the Defendants.

25.     Defendant Barnes & Noble Education, Inc. is a Delaware corporation based in Basking Ridge, New Jersey and is the parent company of Barnes & Noble College Bookstores, LLC.

26.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware entity based in Basking Ridge, New Jersey that operates on-campus bookstores from which it sells Inclusive Access course materials at higher education institutions across the United States.

27.     Defendant Follett Higher Education Group, Inc. is an Illinois corporation based in Westchester, Illinois that operates on-campus bookstores from which it sells Inclusive Access course materials at higher education institutions across the United States.

28.     Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, Massachusetts that publishes Inclusive Access textbooks and course materials.

29.     Defendant McGraw Hill LLC is a Delaware entity with its principal place of business in New York that publishes and sells Inclusive Access textbooks and course materials.

30.     Defendant Pearson Education, Inc. is a Delaware corporation based in Upper Saddle River, New Jersey that publishes and sells Inclusive Access textbooks and course materials.

## FACTUAL ALLEGATIONS

31.     Course materials at colleges and universities include traditional textbooks and other printed materials, as well as digital or e-textbooks/materials used as an alternative to hard copy materials.  In the digital context, students typically obtain access by purchasing codes that unlock the online content, which can include homework, assignments, quizzes, tests, and/or other learning software.

32.     According to the Association of American Publishers, the estimated annual revenue for higher education textbooks and other course materials was nearly $3 billion as of December 2019.

33.     The market for these textbooks and other materials is captive in the sense that higher education institutions select the materials to be purchased by students.

34.     The Publisher Defendants reportedly control close to 90 percent of the market for the publication and sale of college textbooks and other course materials in the United States.

35.     The Publisher Defendants market and sell textbooks and other course materials to colleges and universities, not directly to students based on price.

36.     In a competitive market, the Publisher Defendants would compete with each other on the type, content, quality, service, and price of textbooks and other course materials.

37.     The Retailer Defendants contract with colleges to operate on-campus stores that sell textbooks and other course materials. Independent retailers, including off-campus stores and online sellers, have historically competed with on-campus bookstores for the sale of textbooks and other course materials.

38.     The Retailer Defendants operate over 50 percent of the on-campus stores in the United States that cover nearly two-thirds of all college students nationwide.

39.     The Retailer Defendants pay for the right to operate on-campus bookstores and those costs have increased significantly as the Retailer Defendants have reaped higher profits from Inclusive Access systems.

40.     Prior to Inclusive Access, the Retailer Defendants faced competition from a variety of sources as colleges and faculty members selected textbooks and other course materials that publishers made available for purchase by all retailers at the same price. Students were then

able to search out competitive pricing and terms from various sellers, including off-campus stores and online vendors.

41.    Prior to the conspiracy alleged herein, student spending on textbooks and other course materials from the Publisher Defendants had declined considerably as students had access to many alternatives.

42.    Reported data shows that from 1997 to 2007, college bookstores sold used textbooks at an average of approximately 75 percent of the new textbook price pursuant to contracts that set the ceiling for used textbooks at 75 percent of the new textbook price.

43.    By contrast, a 2015 study showed that used textbook prices from online sellers such as Amazon averaged 30 percent of the new textbook price.  Such competition led to lower prices for students while also decreasing profits for the Publisher Defendants.

44.    In 2016, the Publisher Defendants formed the Educational Publishers Enforcement Group ("EPEG") with the stated purpose of combatting counterfeit textbooks.  In fact, the EPGE serves as a mechanism for the Publisher Defendants to communicate with one another to impose and expand Inclusive Access policies under the guise of devising anti-counterfeiting policies ("EPEG Guidelines") that restrict competition for textbooks.

45.    The EPEG Guidelines limit which retailers are allowed to sell textbooks in order to curtail supply and create a captive market for the Publisher Defendants and allow them to charge higher prices. By creating a "white list" of acceptable retailers, the EPEG encouraged its members sell only to those retailers as a means of reducing competition from off-campus and other secondary vendors, despite the fact that the vast majority of retailers not on the white list were simply selling used textbooks and not engaged in any form of counterfeiting.

46.    The EPEG also facilitated the implementation and expansion of Inclusive Access by the Publisher Defendants and enforcement of its terms, which was a direct response to competition from secondary sources and decreased profitability for the Publisher Defendants.

47.    Under Inclusive Access, students receive limited access to online versions of textbooks and other course materials, which access expires after the semester is over and with costs often billed directly to a student's tuition.  Access can be arranged only through an official on-campus bookstore, whether run by a Retailer Defendant or directly by the school. Students are normally unable to purchase Inclusive Access materials from any other source as the Publisher Defendants refuse to sell to any other potential competitor.

48.    Students are effectively required to purchase the Inclusive Access materials in order to obtain necessary materials to pass the course and are often automatically enrolled in Inclusive Access.

49.    While students technically have the legal right to opt out of Inclusive Access programs, they may also be required to certify that they purchased the required course materials from another source, which as a practical matter is usually impossible.

50.    The effect of Inclusive Access is to exclude any competition for course material purchases by eliminating the secondary market for students to purchase textbooks and other course materials.  The only option is mandated purchases of Inclusive Access materials from the Publisher Defendants and, at the majority of colleges where they operate the official on-campus bookstore, the Retailer Defendants.

51.    Defendants' Inclusive Access scheme enabled them to reverse the decline in profits caused by increased competition, successfully monopolize the market for Inclusive

Access textbooks and course materials, and charge artificially high prices to Plaintiffs and other Class members.

52.    Executives of the Publisher Defendants have stated their intention to eliminate the used book market altogether. Cengage CEO Michael Hansen agreed in an interview that his goal is to rid the industry of the used textbook market. McGraw-Hill CEO Nana Banerjee stated: "[a]nd there is a half-life that is associated with kind of taking out this used secondary market book enterprise that really has been a disruptor for us."

53.    On many campuses where the official on-campus bookstore is run by a Retailer Defendant, Inclusive Access is an exclusive licensing arrangement between the Publisher Defendants, the Retailer Defendant, and the university. Under these agreements, the Publisher Defendants agree to sell Inclusive Access materials only through the Retailer Defendant operating the official on-campus bookstore. These license agreements are nearly identical to one another, further evidence of collusion between Defendants to impose the Inclusive Access program.

54.    There are also direct exclusivity agreements between each Publisher Defendant and each Retailer Defendant whereby the Publisher Defendants will not sell Inclusive Access materials to retailers other than a Retailer Defendant on any campuses where a Retailer Defendant operates the official on-campus store.

55.    When asked by retailers other than the Retailer Defendants or on-campus bookstores operated by universities, the Publisher Defendants refuse to sell Inclusive Access materials, pointing either to an exclusive arrangement with a Retailer Defendant or college-run on-campus store, or stating that the Inclusive Access materials could not be made available in a format that would allow those off-campus or online retailers to resell them to students.

56.    In the few instances where the Publisher Defendants have sold Inclusive Access materials to off-campus retailers, often in the face of legal intervention, the materials were sold at a substantially higher price than that paid by the Retailer Defendants or on-campus bookstores operated by universities. This resulted in the off-campus retailers being unable to sell the materials at a competitive price and unable to compete with the Retailer Defendants or college-run on-campus bookstores for sales.

57.    Defendants claim that Inclusive Access brings technological advantages, but in reality, it simply offers the same textbooks and course materials in a restricted electronic-only format, and with time-limited access, and at a higher price.

58.    In addition to being more expensive, Inclusive Access does not allow students to print course materials or keep them for future reference.

59.    Inclusive Access can also require instructors to spend valuable time in class explaining how to use the system and students can be cut off from materials due to technical problems or lack of Internet access, both problems not associated with printed course materials.

60.    A study by the Tennessee Board of Regents comparing student performance before and after the use of Inclusive Access found that the percentage of students who obtained a grade of at least "C" actually declined in a majority of courses after switching to Inclusive Access.

61.    The Publisher Defendants also justify Inclusive Access by claiming the cost to students is lower. In fact, while in some cases the price may be lower than the list price of new versions of the Inclusive Access textbook, those list prices are set by the Publisher Defendants that can be artificially inflated to make it appear that Inclusive Access is a bargain.  In reality,

Inclusive Access prices are far higher than the prices that would prevail if Defendants faced open competition from used books, off-campus retailers, and online retailers and sellers.

62.     By way of example, the Inclusive Access price of N. Gregory Mankiw's Principles of Economics at UCLA is reportedly $108.98 while it can be rented for $34.51 from Amazon or education technology company Chegg. Mankiw is estimated to have made $42 million in royalties from his textbook, illustrating the profitability of a best-selling textbook title on the Inclusive Access system.

63.     In their recent letter to the DOJ expressing "serious concerns" about the proposed merger between Defendants Cengage and McGraw-Hill, six United States Senators specifically noted that "textbook prices have skyrocketed" over the past 50 years, the textbook industry is "highly concentrated" and "a perfect example of a captive market," and "publishers are pushing more students into digital subscriptions and bundling textbooks with digital access codes" that "eliminate choice" when "billed to students through 'inclusive access' programs—and that more consolidation in the industry "risks further aggravating the affordability of education."

## CLASS ALLEGATIONS

64.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as representatives of a Class defined as follows:

> All students at colleges or graduate schools in the United States and its territories who were required to purchase textbooks or course materials through Inclusive Access plans. Excluded from the Class are Defendants and their employees.

65.     Plaintiffs satisfy the requirement of Federal Rule of Civil Procedure 23(a)(1) as the members of the proposed Class are so numerous that joinder is impracticable. There are at

least hundreds of thousands of college students who were required to purchase textbooks and

other course materials from the Defendants pursuant to Inclusive Access plans.

66.     Plaintiffs likewise satisfy the requirements of Rule 23(a)(2) and (b)(3) as there are

numerous questions of law and fact common to the Class that predominate over any

individualized issues, including:

a.     Whether the Publisher Defendants and Retailer Defendants agreed to create, promote, implement and enforce the Inclusive Access system;

b.     Whether the Publisher Defendants agreed among themselves to fix and raise the price of textbooks and course materials under the Inclusive Access system;

c.     Whether the Publisher Defendants agreed with college-run campus bookstores to create, promote, implement and enforce the Inclusive Access system;

d.     Whether the Publisher Defendants collectively refused to deal with independent retailers that sought to sell Inclusive Access materials;

e.     Whether Defendants agreements and actions violated the federal antitrust laws;

f.     The time period, number of universities, and number of students impacted by the Inclusive Access system;

g.     Whether the Publisher Defendants had sufficient market power to foreclose competition and charge artificially high prices;

h.     Whether the Retailer Defendants had monopoly power;

i.     Whether Inclusive Access has any legitimate pro-competitive justification;

j.     Whether the conduct alleged herein allowed the Publisher Defendants to artificially maintain, preserve, or enhance their power in the market for college textbooks and course materials subject to Inclusive Access;

k.     Whether the conduct alleged herein allowed the Retailer Defendants to artificially maintain, preserved, or enhance their monopoly power in the market for college textbooks and course materials subject to Inclusive Access where the Retailer Defendants operate official on-campus bookstores;

l.     Whether Defendants in fact foreclosed competition via the Inclusive Access system;

m.     Whether the actions of the Publisher Defendants as described herein were a violation of the Sherman Act;

n.     Whether the actions of the Retailer Defendants as described herein were a violation of the Sherman Act;

o.    Whether Plaintiffs and the Class suffered injury as a result of the Defendants' actions, and if so, the extent of monetary damages; and

p.    Whether injunctive and equitable relief is appropriate.

67.    Plaintiffs also satisfy the requirements of Rule 23(a)(3) in that their interests in this matter are typical of and not in conflict with those of other members of the Class. Accordingly, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class.

68.    Plaintiffs and their counsel further satisfy Rule 23(a)(4) having retained counsel with substantial experience litigating complex antitrust class actions.

69.    This proposed class action also satisfies Rule 23(b)(1) as individual Class members prosecuting separate actions would be risk inconsistent outcomes.

70.    Class certification under Rule 23(b)(2) is appropriate because Defendants acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is warranted.

71.    Finally, a class action is superior to any other available options for the fair, efficient adjudication of this controversy and presents no unusual manageability issues. Individual lawsuits by each Class member here would also strain judicial resources, create the risk of inconsistent judgments, and increase the delay and expense for all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of a single adjudication with all attendant efficiencies.

## **RELEVANT MARKET**

72.    Plaintiffs allege that Defendants' conduct was per se illegal under the antitrust laws in that the Publisher Defendants and Retailer Defendants colluded to establish, operate, maintain and enforce the Inclusive Access policy to monopolize the market for textbooks and

14

other course materials, constrain competition, and limit supply, all for the purpose of artificially raising prices for Plaintiffs and the Class.

73.     Should the claims herein be assessed under the rule of reason or otherwise require a specific market definition, Plaintiffs alternatively allege that the relevant product market is higher education textbooks and other course materials sold under the Inclusive Access system (the "Inclusive Access Market").

74.     The relevant geographic market for this action is the United States.  Within that geographic market, however, Inclusive Access materials are only available for purchase from official on-campus retailers, whether run by the Retailer Defendants or by an institution of higher learning itself.  Inclusive Access materials are generally not available from any other source other than in rare instances and at a higher cost. Accordingly, the limited availability of potential substitutes does not impose any meaningful price competition on Defendants.

75.     Defendants conspired to eliminate competition from other sources of textbooks and electronic course material so that the Inclusive Access market consists solely of Inclusive Access textbooks and other course materials for which there are no viable substitutes. The availability of alternative textbooks or other course materials does not constrain the price of Inclusive Access materials since Plaintiffs and Class members are precluded from using those alternatives.

76.     The Publisher Defendants had substantial power in the Inclusive Access Market at all relevant times. On information and belief, the Publisher Defendants control over 90 percent of the Inclusive Access Market.

77.     Due to their dominant market position, the Publisher Defendants have the ability to maintain the artificially high prices for Inclusive Access materials without the threat of losing significant sales.

78.     The Retailer Defendants likewise had substantial power in the Inclusive Access Market at all relevant times wherever they operate official on-campus bookstores with Inclusive Access programs.

79.     Due to their dominant market position, the Retailer Defendants also have the ability to maintain artificially high prices for Inclusive Access without the threat of losing significant sales.

80.     The Retailer Defendants control over 50 percent of official on-campus bookstores across the United States and serve nearly two-thirds of all college and graduate students nationwide.

81.     The Inclusive Access Market is susceptible to collusion due to the small number of dominant publishers, a captive market of students who need Inclusive Access materials for their course, the monopoly position of on-campus bookstores, and high barriers to entry resulting from Defendants' established relationships with textbook authors, professors assigning textbooks, and institutions of higher learning.

82.     If Defendants are not enjoined from continuing to engage in anticompetitive behavior, the Inclusive Access Market is likely to capture an increasing share of all college textbook and course material sales, resulting in yet higher prices and further limiting choice Plaintiffs and members of the Class.

## INTERSTATE COMMERCE

83.     Defendants' actions have a significant effect on interstate commerce in the market for college textbooks and course materials.

84.     Defendant B&N operates on-campus college bookstores in 43 states.

85.     Defendant Follett operates on-campus college bookstores in 48 states.

86.     Defendants Cengage, McGraw, and Pearson sell textbooks and course materials through Inclusive Access to students in all 50 states.

87.     The conspiracy alleged by Plaintiffs impacts the market for college textbooks and course materials nationwide.

## FRAUDULENT CONCEALMENT

88.     The Defendants concealed their conspiracy from Plaintiffs and other members of the Class by developing and implementing the Inclusive Access system via private communications, including through trade associations that ostensibly have other purposes. Public statements by the Defendants promoted Inclusive Access to students and universities as a lower cost technological advance responding to consumer demand, not as a conspiracy to raise prices and increase profits by eliminating competition.

89.     Plaintiffs and other members of the Class did not have access to information that would have alerted them to Defendants' conspiracy.  Students told that textbooks and other course materials are only available for purchase through an Inclusive Access system cannot reasonably be expected to question whether such exclusive sourcing is the result of a conspiracy to increase profits by eliminating competition.

90.     As a result of Defendants' efforts to conceal their conspiracy and the true purpose of Inclusive Access, the applicable statute of limitations should be tolled.

**ANTITRUST INJURY**

91.    At any college that uses Inclusive Access with bookstores operated by the Retailer

Defendants, Plaintiffs and Class members are required to purchase Inclusive Access materials

exclusively from the Retailer Defendants at higher prices than if the materials were available in

multiple formats and from different sources.

92.    At any college that uses Inclusive Access with bookstores operated by the college,

Plaintiffs and Class members are required to purchase Inclusive Access materials exclusively

from their official college-run bookstore at higher prices than if the materials were available in

multiple formats and from different sources.

93.    But for the Inclusive Access system, Plaintiffs and other Class members would

have other competitive options to purchase course materials, including new, used or electronic

versions of textbooks from on-campus or off-campus bookstores and other online sources,

including secondary sellers, which in turn would lead to lower prices.

94.    Defendants' actions caused antitrust injury by limiting competition and causing

Plaintiffs and other Class members to pay artificially high prices for textbooks and other course

materials.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**UNLAWFUL AGREEMENT TO RESTRAIN TRADE UNDER 15 U.S.C.§ 1**

95.    Plaintiffs repeat and reallege each of the allegations contained in the paragraphs

above as if fully set forth herein.

96.    The Publisher Defendants agreed to restrain trade in textbooks through the

Inclusive Access conspiracy described herein: (1) working with the Retailer Defendants and

college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate

the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

97.    The Retailer Defendants agreed to restrain trade in textbooks on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

98.    As a result of the Publisher Defendants and Retailer Defendants' Inclusive Access agreements as described herein, Plaintiffs and other Class members had to pay higher prices for textbooks as a result of the elimination of competition, and it has therefore caused them injury.

99.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT TWO
## MONOPOLIZATION UNDER 15 U.S.C.§ 2

100.    Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above as if fully set forth herein.

101.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, the Publisher Defendants, and the Retailer Defendants at universities where a Retailers Defendant operates the official on-campus bookstore, have monopoly power that was acquired willfully through the conspiracy described herein, not as a result of any technological advantages from, or consumer demand for, Inclusive Access.

102.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access and at which a Retailer Defendant operates the official on-campus bookstore, the Publisher Defendants and Retailer Defendants acquired their monopoly power through anticompetitive and exclusionary means, including: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

103.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access and at which the university operates the official on-campus bookstore, the Publisher Defendants acquired their monopoly power through anticompetitive and exclusionary means, including: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

20

104.     These actions by the Publisher Defendants and Retailer Defendants served to create and maintain their monopoly for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

105.     The violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' unlawful Inclusive Access practices.

106.     Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**COUNT THREE**
**ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C.§ 2**

107.     Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above as if fully set forth herein.

108.     In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, the Publisher Defendants, and the Retailer Defendants at universities where a Retailer Defendant operates the official on-campus bookstore, engaged in predatory and anticompetitive conduct with the specific intent and dangerous probability of monopolizing that market.

109.     In the market for Inclusive Access textbooks at each individual university that

110.     uses Inclusive Access and at which a Retailer Defendant operates the official on-campus bookstore, the Publisher Defendants and Retailer Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore,

(2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

111.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access and at which the university operates the official on-campus bookstore, the Publisher Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

112.    There is a dangerous probability that the Publisher Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks at universities that use Inclusive Access, and that the Retailer Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks at the universities at which they operate the official on-campus bookstores, since through these policies they have excluded all other possible competition from that market.

113.    These actions by the Publisher Defendants, and Retailer Defendants where applicable, constitute attempted monopolization of the market for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

114.    The violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

**115.**    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**COUNT FOUR**
**CONSPIRACY TO MONOPOLIZE UNDER 15 U.S.C.§ 2**

116.    Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above as if fully set forth herein.

117.    The Publisher Defendants colluded to restrain trade in textbooks through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access textbooks through at least the following actions: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

118.    The Retailer Defendants colluded to restrain trade in textbooks on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access

textbooks on those universities through at least the following actions: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

119.    The Publisher Defendants and Retailer Defendants committed overt acts in furtherance of the conspiracy alleged herein, including entering into exclusivity agreements between Publisher Defendants, Retailer Defendants, and universities, between Publisher Defendants and Retailer Defendants, and between Publisher Defendants and universities.

120.    These actions by the Publisher Defendants (and Retailer Defendants where applicable) are a conspiracy to monopolize the market for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. § 2.

121.    The Publisher Defendants and Retailer Defendants' conspiracy to monopolize the market for Inclusive Access textbooks at each such university in violation of 15 U.S.C. § 2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

122.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of

Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    Pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

C.    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

D.    Costs, expenses, and reasonable attorney's fees as permitted by law;

E.    Pre-judgment and post-judgment interest on all sums awarded; and

F.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Respectfully submitted,

Dated:  May 5, 2020

/s/ Bradley K. King
Tina Wolfson
Bradley K. King (NJ 081472013)
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: (310) 474-9111; Fax: (310) 474-8585

Kimberly A. Justice
Jonathan M. Jagher
FREED KANNER LONDON
  & MILLEN LLC
923 Fayette St
Conshohocken, PA  19428
Tel. (610) 234-6487
kjustice@fklmlaw.com
jjagher@fklmlaw.com

25

Steven A. Kanner
Robert J. Wozniak, Jr.
FREED KANNER LONDON
   & MILLEN LLC
2201 Waukegan Rd, Suite 130
Bannockburn, IL  60015
Tel. (224) 632-4500
skanner@fklmlaw.com
rwozniak@fklmlaw.com

Katrina Carroll
CARLSON LYNCH LLP
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Tel. (312) 750-1265
KCarroll@CarlsonLynch.com

Cornelius P. Dukelow
ABINGTON COLE + ELLERY
320 South Boston Avenue
Suite 1130
Tulsa, OK  74103
Tel. (918) 588-3400
cdukelow@abingtonlaw.com

*Counsel for Plaintiffs and the Proposed Class*